# In the United States Court of Federal Claims

No. 20-92C

(Filed Under Seal: May 21, 2020)
(Reissued for Publication: May 29, 2020)[1]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| EFW, INC., | |
| | |
| Plaintiff, | |
| | Post-Award Bid Protest; Rational Basis |
| v. | Standard; Motion for Judgment on the |
| | Administrative Record; Agency |
| THE UNITED STATES, | Discretion; Bias; Conflict of Interest; |
| | Technical Risk Evaluation; Past |
| Defendant, | Performance Evaluation; Prejudice; |
| | Source Selection Decision; Cost |
| and | Realism Evaluation; Best-Value |
| | Determination. |
| ROCKWELL COLLINS, INC., | |
| | |
| Defendant-Intervenor. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Todd J. Canni*, with whom were *J. Matthew Carter*, *Marques O. Peterson*, *Kevin J. Slattum*, and *Kevin R. Massoudi*, Pillsbury Winthrop Shaw Pittman LLP, Los Angeles, California, for Plaintiff EFW, Inc.

---

[1] The Court issued this decision under seal on May 21, 2020, and invited the parties to submit proposed redactions of any proprietary, confidential, or other protected information on or before May 28, 2020.  Prior to filing its protest at this Court, EFW filed the protest at the Government Accountability Office, heightening the risk that information regarding how EFW was evaluated would be disclosed.  On May 27, 2020, EFW proposed several redactions relating to its technical approach and most probable cost.  Dkt. No. 66.  The Government and Collins opposed the redactions.  Dkt. No. 67.  The Court agrees with the Government and Collins.  EFW's redactions are extensive enough to make the opinion difficult to understand and seeing the entire opinion outweighs any objections from EFW.  See Joint Venture of Comint Sys. Corp. v. United States, 102 Fed. Cl. 235, 235 n.* (2011); Baystate Techs., Inc. v. Bowers, 283 F. App'x 808, 810 (Fed. Cir. 2008).  Accordingly, the Court finds that the nature of the information EFW seeks to redact does not outweigh the public interest in accessing an unredacted version of the opinion and the Court is issuing this opinion without redactions.

*Alison S. Vicks*, Trial Attorney, with whom were *Joseph H. Hunt*, Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Deborah A. Bynum*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., and *Bridget A. Jarvis*, Naval Air Systems Command, Office of General Counsel, Patuxent River, Maryland, for Defendant.

*Daniel R. Forman*, with whom were *John E. McCarthy Jr.*, *Christian N. Curran*, *William B. O'Reilly*, and *Christopher R. Hebdon*, Crowell & Moring LLP, Washington, D.C., for Defendant-Intervenor, Rockwell Collins, Inc.

## OPINION AND ORDER

WHEELER, Judge.

This bid protest involves a contract by the Department of the Navy, Naval Air Warfare Center ("NAVAIR") for binocular helmet-mounted display systems for helicopter pilots. In this post-award bid protest, Plaintiff EFW, Inc. challenges NAVAIR's evaluation of EFW's proposal and its decision to select intervenor defendant Rockwell Collins, Inc., a part of Collins Aerospace ("Collins"). EFW argues that NAVAIR's decision to select Collins was arbitrary and unreasonable.

Currently before the Court are the parties' cross-Motions for Judgment on the Administrative Record ("MJAR"), filed pursuant to Rule 52.1 of the Court. For the following reasons, the Court DENIES EFW's MJAR and DENIES its accompanying request for a permanent injunction. The Court GRANTS the Government's and Collins's MJARs.

## Background

### I.   The Solicitation

On December 7, 2018, NAVAIR issued its request for proposals for night vision devices and helmet displays for the Enhanced Visual Acuity ("EVA") Program. Administrative Record ("AR") Tab 10. The RFP anticipated that the night vision devices would be developed over several phases. Id.

Under the terms of the solicitation, evaluation of the proposals was to be carried out by the Source Selection Evaluation Board ("SSEB"). AR Tab 80. Following review of the proposals by the SSEB, the Source Selection Authority ("SSA") was in turn charged with determining which proposal represented the best value to the Government and selecting the awardee. Id. The solicitation directed the SSA to select the proposal that provided the best value. AR Tab 10 at 117, 214. The RFP specified that:

proposals meeting the solicitation requirements with the lowest cost/price may not be selected for an award if award to a higher-priced Offeror is determined to be more beneficial to the Government.  However, the perceived benefits of the higher-priced proposal must merit the additional cost/price.

Id. at 204.  To conduct the best value analysis, the agency considered an offeror's (1) technical approach, (2) past performance, and (3) cost.  Id.

A.    Technical Evaluation

In assessing the technical approach, NAVAIR assigned a separate Technical Rating and Technical Risk Rating.  Id. at 205.  The Technical Rating assessed a proposal's compliance with the solicitation's requirements.  Id. at 204–05.  The Technical Rating was based upon the following elements of the offeror's approach: "System Overview, Risk Identification and Mitigation, Display Field of View and Night Vision Camera Field of View, Scene Display Artifacts, Night Vision, Technical Maturity, Experience, and Small Business Management."  Id.  For the Technical Rating, NAVAIR could assign an adjectival rating of acceptable, marginal, or unacceptable.  Id. at 207.

| Green | Acceptable | Proposal indicates an adequate approach and understanding of the requirements. |
|---|---|---|
| Yellow | Marginal | Proposal has not demonstrated an adequate approach and understanding of the requirements. |
| Red | Unacceptable | Proposal does not meet requirements of the solicitation and, thus, contains one or more deficiencies and is unawardable. |

Id.

The Technical Risk Rating evaluated the risk associated with the proposal's technical approach, focusing on the "potential for disruption of schedule, increase in costs, degradation of performance, the need for increased Government oversight, or the likelihood of unsuccessful contract performance."  Id. at 205.  The RFP allowed for "Risk Reducers" for elements of a proposal that reduced the technical risk and were advantageous to the agency.  Id.  The technical evaluation also required a technology readiness assessment to determine the technical maturity of the offeror's proposed solution.  Id. at 182.  Pursuant to the RFP, an offeror could receive the following Technical Risk ratings:

| Rating | Description |
|---|---|

3

| Low | Proposal may contain weakness(es) which have little potential to cause disruption of schedule, increased cost or degradation of performance. Normal contractor effort and normal Government monitoring will likely be able to overcome any difficulties. |
|---|---|
| Moderate | Proposal contains a significant weakness or combination of weaknesses, which may potentially cause disruption of schedule, increased cost or degradation of performance. Special contractor emphasis and close Government monitoring will likely be able to overcome difficulties. |
| High | Proposal contains a significant weakness or combination of weaknesses, which is likely to cause significant disruption of schedule, increased cost or degradation of performance. Is unlikely to overcome any difficulties, even with special contractor emphasis and close Government monitoring. |
| Unacceptable | Proposal contains a material failure or a combination of significant weaknesses that increases the risk of unsuccessful performance to an unacceptable level. |

Id. at 207–08.

B.     Past Performance

With respect to Past Performance, the RFP provided Performance Confidence Assessment Ratings based on an "integrated assessment of all performance areas." Id. at 184–85. The Past Performance Evaluation Team ("PPET") conducted the Past Performance evaluations. Id. The evaluators valued Past Performance by reviewing the Contract Performance Assessment Reporting System ("CPARS") and past performance questionnaires ("PPQs") completed by the procuring contracting officer, administrative contracting officer, or the program manager from prior contracts. Id. The evaluators considered prior issues and the offerors' actions taken to resolve any identified problems. Id. at 187–89, 204–06. The RFP's procedures allowed for the following Past Performance Confidence Assessment:

| Rating | Description |
|---|---|
| Substantial Confidence | Based on the Offeror's recent/relevant performance record, the Government has a high expectation that the Offeror will successfully perform the required effort. |

| Satisfactory Confidence | Based on the Offeror's recent/relevant performance record, the Government has a reasonable expectation that the Offeror will successfully perform the required effort. |
|---|---|
| Neutral Confidence | No recent/relevant performance record is available or the Offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. The Offeror may not be evaluated favorably or unfavorably on the factor of past performance. |
| Limited Confidence | Based on the Offeror's recent/relevant performance record, the Government has a low expectation that the Offeror will successfully perform the required effort. |
| No Confidence | Based on the Offeror's recent/relevant performance record, the Government has no expectation that the Offeror will be able to successfully perform the required effort. |

Id. at 206.

>C.     Cost Evaluation

For Cost/Price the evaluators considered seven different Contract Line Item Numbers ("CLINs"), priced on either a Cost Plus Fixed Fee ("CPFF") or a Fixed Price Incentive Fee ("FPIF") basis. Id. CLINs 0001 (the EVA Engineering, Manufacturing and design effort) and 0003 (Engineering Development Models) were designated as Cost Plus Fixed Fee and assessed for "realism, completeness, and consistency with respect to the offeror's technical approach." Id. Evaluators assessed the Fixed Price Incentive Fee CLINs for reasonableness only. Id.

>D.     The Present Dispute

NAVAIR received two proposals by the February 19, 2019 closing date, one from Collins and one from EFW. AR Tab 80 at 14,453. On March 22, 2019, after completing its evaluation of the initial proposals, NAVAIR formed a competitive range that included both offerors' proposals. Id. Both offerors submitted Final Proposal Revisions on August 12, 2019. Id. Shortly thereafter, NAVAIR re-opened discussions to obtain certain clarifying information. Id. at 14,453–54. On September 24, 2019, both offerors provided a second set of Final Proposal Revisions. Id.

Upon completion of its technical evaluation the SSEB assigned the following ratings:

|  | Collins | EFW |
|---|---|---|
| Technical Rating | Acceptable | Acceptable |
| Technical Risk | Moderate | Moderate |
| Risk Reducer | Two | Four |
| Significant Weakness | Two | One |
| Uncertainties | None | None |
| Deficiencies | None | None |

Id. at 14,471, 14,490.

After performing the overall evaluation, the SSA awarded the contract to Collins. Based on her review of both offerors' proposals, the SSA agreed with the SSEB's adjectival ratings, assigning the following:

|  | Collins | EFW |
|---|---|---|
| Technical Approach | Acceptable | Acceptable |
| Technical Risk | Moderate | Moderate |
| Past Performance | Satisfactory Confidence | Satisfactory Confidence |
| Most Probable Cost | $46.5 million | $53.4 million |

AR Tab 125 at 16,426; see also AR Tab 78 at 14,436; AR Tab 80.

## II.   Procedural History

Prior to filing its protest at this Court, EFW filed a series of bid protests at the Government Accountability Office ("GAO") challenging NAVAIR's decision to award Collins the contract. AR Tab 89, 95, 115, 119. EFW argued that NAVAIR misevaluated the offerors' proposals, making an unreasonable source selection decision. AR Tab 125 at 16424. At the GAO, EFW alleged that: (1) NAVAIR's evaluation of the Technical Risk Ratings for each offeror did not comply with the RFP; (2) the Source Selection Authority's ("SSA") departure from the Source Selection Evaluation Board's ("SSEB") application of a risk reducer for EFW's dual-sensor approach was unreasonable; (3) NAVAIR's assessment of significant weakness in EFW's proposal due to lack of technical maturity used unstated evaluation criteria; (4) the agency evaluators failed to inform the SSA about adverse past performance information pertaining to Collins; (5) a past performance questionnaire for Collins completed by an SSEB member improperly swayed evaluators and should have been excluded due to the evaluator's inherent conflict of interest; (6) NAVAIR's cost realism analysis failed to account for Collins's "unrealistically low cost estimate"; and (7) NAVAIR's best-value determination was flawed because it selected Collins's proposal based on price and failed to "look behind" the proposal's adjectival

ratings.  AR Tab 125.  On January 21, 2020, the GAO rejected each of EFW's arguments and dismissed the protest.  Id.

EFW filed its complaint in this Court on January 27, 2020.  EFW's claims are substantially similar to those in its GAO protest.  On February 12, 2020, EFW filed a motion to supplement the administrative record and stay MJAR briefing.  Dkt. No. 34.  The Court granted the stay, pending a resolution of EFW's motion to supplement.  Dkt. No. 39. In its motion to supplement, EFW argued that the administrative record contained "glaring holes."  Dkt. No. 46 at 2.  The Government opposed the motion, arguing attorney-client and deliberative process privileges applied and characterized EFW's requests as "interrogatories disguised as document requests."  Id. (internal citation omitted).  After reviewing the documents *in camera*, the Court granted EFW's motion in part, identified 18 documents for the Government to produce, and lifted the stay.  Id. at 4.  Shortly thereafter, EFW filed an amended complaint to incorporate the "newly revealed information" it obtained from these documents.  Dkt. No. 47 at 2; see also Dkt. No. 50 (Am. Compl.). Thereafter, the Court received the parties' cross-motions for judgment on the administrative record, as well as response briefs and reply briefs.  Dkt. Nos. 53–54, 57, 59, and 60.

The Court heard oral argument on the parties' MJARs on April 14, 2020.  At the conclusion of the oral argument, due to the importance of the contract and to avoid any further delays caused by COVID-19, the Court issued a bench ruling in Collins's favor that would allow the agency to go forward with the contract originally awarded to it.  The Court outlined the reasons for its bench ruling but stated that it would issue this formal opinion as promptly as possible.

## Discussion

I.    Standard of Review

The Tucker Act grants this Court subject-matter jurisdiction over bid protests.  28 U.S.C. § 1491(b)(1).  In a bid protest, the Court reviews an agency's decision pursuant to the standards set out in the Administrative Procedure Act ("APA").   28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706.  The APA provides that "a reviewing court shall set aside the agency action if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

An agency's decision does not violate the APA if the agency "provided a coherent and reasonable explanation of its exercise of discretion."  Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001).  Further, an agency must articulate a "rational connection between the facts found and the choice made."  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (citation omitted).  The Court's review is "highly deferential" to the

agency as long as the agency has rationally explained its award decision. Bannum, Inc. v. United States, 91 Fed. Cl. 160, 169–70 (2009).

Even if the agency acted without a rational basis, the Court cannot grant relief unless the agency's action prejudiced the protestor. See id. at 170; see also Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). An erroneous agency action prejudices a protestor if, but for the agency's error, there was a "substantial chance" that the agency would have awarded the contract to the protestor. Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (internal citation omitted); see also Bannum, 91 Fed. Cl. at 170.

II.     NAVAIR's Evaluation of EFW's Proposal Was Not Arbitrary

        A.     Past Performance Evaluation

EFW begins by challenging NAVAIR's Past Performance evaluation. Dkt. No. 48 at 9. According to EFW, NAVAIR ignored the offerors' "marked contrast in performance history." Dkt. No. 48 at 9. EFW relies on a prior contract (the "P4 contract") with NAVAIR where Kollsman, Inc. ("Kollsman"), a subsidiary of EFW, and Collins formed a joint venture. AR Tab 94j. Sonny Guy, a NAVAIR official, provided Kollsman with a positive Past Performance evaluation while concluding that he would "probably not" work with Collins again. AR Tab 94d at 15,073–79. EFW maintains that the "probably not" evaluation "could not simply be discussed in cursory fashion—as had occurred in the 'Final SSA Briefing slide deck,' but necessitated deliberate consideration and an explanation of the outcome of that evaluation." Dkt. No. 48 at 11–12.

Nevertheless, the evaluators considered favorable information about Collins's performance during the P4 contract submitted by an SSEB member, which EFW argues should have been excluded. Id. at 14. In support, EFW points to the "highly damning" PPQ authored by Mr. Guy which concluded that he would "probably not" work with Collins again. Am. Compl. ¶ 6; see also AR Tab 78 at 14,418. According to EFW, in an effort to "recast" Collins's performance, Jamie Billig, a member of the SSEB and also the procuring contract officer for the P4 contract, submitted a second PPQ. Dkt. No. 48 at 30. Unlike Mr. Guy's PPQ, Mr. Billig concluded that he would "maybe" work with Collins again. AR Tab 96d. EFW concludes that Mr. Billig's subsequent and more positive evaluation should have been excluded due to the author's role on the SSEB. Dkt. No. 48 at 13. This dual role, EFW argues, created an inherent conflict of interest which irreparably "tainted" NAVAIR's decision. Dkt. No. 48 at 15.

The Government and Collins argue that Mr. Guy's initial performance questionnaire was incomplete, and, despite multiple attempts, the evaluators were unable to get him to provide all the missing information, thus necessitating a second performance evaluation to fill in the gaps. See Dkt. No. 53 at 38–39; Dkt. No. 54 at 19. Collins contends that EFW's

argument is "disingenuous," noting that EFW's proposal identified Mr. Billig as a point of contact to validate Kollsman's performance during the P4 contract.  Dkt. No. 59 at 13 (citing AR Tab 16 at 2973, 2975, 2977).

The Government and Collins also point out that despite the original performance evaluation's adverse conclusion, Mr. Guy provides Collins with a "Satisfactory" technical performance evaluation.  AR Tab 94d at 15,073–79.  Moreover, this performance evaluation was just one of seven prior contracts considered by the evaluators.  AR Tab 80 at 14,496, 14,498, 14,500.  The Government and Collins note that EFW's relevant past performance also included instances of adverse performance.  See Dkt No. 53 at 23 (citing AR Tab 80 at 14,515) ("Specifically, the Government found adverse performance with no systemic improvement demonstrated on the Defense Logistics Agency (DLA) ANVIS Spares contract.").

In evaluating the agency's decision, the Court affords significant deference to the agency's evaluation of the offerors' past performance.  See Westech Int'l v. United States, 79 Fed. Cl. 272, 293 (2007) ("When the court considers a bid protest challenge to the Past Performance evaluation conducted by the agency, the 'greatest deference possible is given to the agency.'" (internal citation omitted)); Fort Carson Support Servs. v. United States, 71 Fed. Cl. 571, 598–99 (2006).  Courts have found an evaluator serving also as a past performance reference does not create a conflict of interest.  See Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1336 (Fed. Cir. 2004).  Typically, conflicts of interest exist only when an evaluator stands to gain or lose from the contracting decision.  See Fed. Mgmt. Sys., Inc. v. United States, 61 Fed. Cl. 364, 369 (2004); JWK Int'l Corp. v. United States, 52 Fed. Cl. 650, 657–58 (2002).

Here, EFW fails to demonstrate how any potential bias actually tainted the award decision.  EFW does not allege that the author of the second evaluation had anything to gain or lose from the contracting outcome.  The mere fact that the author evaluated a single prior contract and was a member of the SSEB does not alone constitute a conflict of interest.  See JWK Int'l Corp., 52 Fed. Cl. at 657–58.  If anything, the SSEB member's prior role as contracting officer "enhanced" NAVAIR's evaluation as he could provide direct knowledge of Collins's past performance.  See Galen Med. Assocs., 369 F.3d at 1336.  To the extent an error exists, the exclusion of the contracting officer's performance evaluation from the SSEB's final report put Collins, not EFW, at a disadvantage.  See id. Notably, even the negative Past Performance evaluation acknowledged that Collins had rectified the identified issues.  AR at 14,497.

Moreover, the record demonstrates that NAVAIR conducted a detailed review of both offerors' past performance records.  Agencies are given discretion to determine the relevance of all past performance information.  See 48 C.F.R. § 15.305(a)(2)(ii).  Contrary to EFW's position, the record does not indicate that Collins's satisfactory rating was unreasonable.  Rather, the record demonstrates that NAVAIR considered both the positive

and adverse aspects of both Collins's and EFW's past performance.  AR Tab 80; AR Tab 81 at 14,543.

Apart from its argument that NAVAIR's inclusion of the second past performance questionnaire was unreasonable, EFW argues that NAVAIR inadequately documented how the "probably not" rating impacted the SSA's decision.  Dkt. No. 48 at 15.  An agency is required to provide a reasonable explanation for its decision, but that explanation need not be extensive.  See Camp v. Pitts, 411 U.S. 138, 142–43 (1973); Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1338.  NAVAIR sufficiently articulated its reasons for assigning Collins a satisfactory Past Performance rating and explained:

> Taking this adverse performance in the context of [Collins'] entire performance record reduces its negative impact on the Government's overall confidence assessment; however, some risk remains that the Offeror will experience issues related to quality and schedule.  Therefore, there is a reasonable expectation that the Offeror will successfully perform the required effort.

AR Tab 80 at 14,501–02.  Contrary to EFW's assertion, NAVAIR downgraded Collins's rating from "substantial confidence" to "satisfactory confidence" as a result of the negative performance evaluation.  See Supp. Doc. No. 29.  Accordingly, NAVAIR's scoring does not demonstrate even unconscious bias, particularly under the clear and convincing standard of proof applicable here.  See Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239 (Fed. Cir. 2002).  Therefore, the record supports NAVAIR's assessment of a satisfactory confidence rating.

## B.   Procedural Regularity

Next, EFW argues that NAVAIR made a premature informal decision to award Collins the contract prior to completing its evaluation of both proposals, suggesting that the agency acted in bad faith.[2]  Dkt. No. 48 at 16.  The record shows that the SSEB included both performance questionnaires in the initial presentation to the SSA.  AR Tab 78 at 14,418–19.  The SSEB, however, excluded Mr. Billig's subsequent PPQ from its final report due to "possible appearance issues"; thus, leaving only Mr. Guy's adverse performance evaluation for consideration during the final past performance evaluation.  AR Tab 110 at 16,181–83; see also AR Tab 80 at 14,496–99.

EFW contends that the SSEB should have revisited its initial recommendation in light of the PPET Lead's decision to exclude the second performance evaluation from the final SSEB Report.  Dkt. No. 57 at 22–23.  On August 28, 2019, the SSEB Chair presented

---

[2] During oral arguments EFW argued that the decision to award the contract to Collins resulted from process errors and not bad faith.

the "Final Evaluation Results" to the SSA.  AR 14,407.  EFW argues that this presentation was premature because (1) the PPET did not complete its Past Performance evaluation until September 23, 2019 and (2) the SSEB's final report was not finished until September 25, 2019.  AR Tab 80.  Because the SSEB's final report did not include Mr. Billig's favorable past performance questionnaire, EFW argues that the SSEB needed to "meaningfully revisit" its August 28, 2019 presentation to the SSA.  See Dkt. No. 57 at 22–23.  EFW acknowledges that the SSEB Chair conducted a second briefing for the SSA on September 23, 2019, but notes no new slides were created.  Id. at 23; see also AR Tab 72 at 13,344; AR Tab 73 at 14,161.  Essentially, EFW argues that because the briefing slides were not updated after the completion of the Past Performance evaluation, the evaluators made a "premature informal decision" to make the award to Collins prior to completing its evaluation.  See Am. Compl. ¶¶ 21–23.

However, the performance slides are not the only memorialization of the SSEB's decision-making.  The Government points to the SSEB's final report on September 23, 2019, which takes into account the offerors' updated final reports and completed performance evaluations.  AR Tab 80 at 14,496–99.  EFW even concedes that the SSEB Chair conducted a second briefing to the SSA after the past performance evaluation was completed.  Am. Compl. ¶ 22.  During the second briefing, the SSA provided the final results of its evaluation, which included the final report omitting the second performance questionnaire but contained a summary of the adverse evaluation for Collins associated with the P4 contract.  AR Tab 80.  In any event, the Government and Collins argue that the second performance questionnaire did not materially affect the evaluation, making any inclusion of it reasonable.  See Dkt. No. 54 at 40; Dkt. No. 53 at 43.  In fact, the PPET Lead's decision to exclude Mr. Billig's subsequent PPQ was in part because it was "redundant."  AR Tab 110 at 16,181–83.

It should be noted that EFW's position with respect to the exclusion of the second PPQ in the final report is inconsistent with its arguments on the alleged flaws of the SSEB's presentation to the SSA.  On one hand EFW argues that the SSA improperly considered the second performance questionnaire, which, EFW proffers, NAVAIR should have excluded due to its inherent bias.  On the other hand, EFW argues that the evaluators did not adequately consider or address the second PPQ.  Dkt. No. 48 at 33–34.  As discussed above, the Court has determined there was no conflict of interest, so any inclusion was not improper.

The SSA's final decision takes into account the SSEB's final report, includes a comparative analysis, and documents the trade-offs for each offeror's technical, past performance, and total evaluated cost/price valuation.  AR Tab 81.  "Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision."  48 C.F.R. § 15.308.  Additionally, EFW's arguments regarding the SSEB's timing of its presentations are not persuasive.  It was within the SSEB's discretion to conduct more than one briefing for the SSA.  See E.W. Bliss Co. v.

11

United States, 77 F.3d 445, 449 (Fed. Cir. 1996).  Accordingly, based on the record, and providing the appropriate deference to the agency's judgment, the Court cannot conclude that NAVAIR's Past Performance evaluation was inconsistent with the record.

### C.    Cost Realism

Next, EFW challenges NAVAIR's cost realism analysis and argues that the agency ignored "core components" of Collins's cost proposal.  Dkt. No. 48 at 18.  EFW argues that Collins's lower proposed level of effort resulted in an unrealistically low cost estimate. Id.  According to EFW, NAVAIR was "blinded" by Collins's Independent Research & Development ("IR&D") costs, causing it to overlook Collins's "grossly underestimated" levels of effort.  Id. at 18, 37–38.  EFW focuses on the Collins proposal's lower levels of effort and costs, particularly for work breakdown structure ("WBS") elements 1.3 (Program Management) and 1.4 (System Testing and Evaluation).  Id. at 18.  EFW posits that the only explanations for the proposals' cost differential is that either Collins "intentionally understated its level of effort" to gain an advantage or made "unrealistic assumptions…because it did not have a clear understanding of the Solicitation's technical requirements."  Id. at 38.

The Government and Collins disagree and argue that NAVAIR conducted a thorough review to ensure the proposed costs were supported by the data.  See Dkt. No. 53 at 47–58; Dkt. No. 54 at 44–45.  The SSA did not "solely" focus on the IR&D costs.  Dkt. No. 54 at 44.  Rather, the Government and Collins reference the SSA's Source Selection Decision Document, which explicitly states that the cost differential was only "in part" from the offerors' differing approaches to IR&D.  Dkt. No. 53 at 48–49 (citing AR Tab 81 at 4–5).  The SSA suggests that the remainder was due to the different technical approaches. AR Tab 81 at 14,543.

A cost realism analysis is designed to determine whether the offeror's proposed costs are realistic for the work to be performed.  See FAR 15.404-1(d)(1); Dellew Corp. v. United States, 128 Fed. Cl. 187, 193 (2016).  An agency's analysis must take into account the information available but need not explain every item supporting the cost analysis.  See United Payors & United Providers Health Servs., Inc. v. United States, 55 Fed. Cl. 323, 330 (2003) (internal citation omitted).  The Court will not disturb an agency's cost realism analysis unless it lacks a reasonable basis.  See United Payors & United Providers Health Servs., 55 Fed. Cl. at 330; Labat-Anderson Inc. v. United States, 50 Fed. Cl. 99, 106 (2001).

Here, EFW's attempts to compare the effort required to develop two sensors to that needed to develop one is tantamount to comparing apples to oranges.  Each offeror had a unique technical approach, understandably leading to disparate cost estimates.  There is nothing in the FAR or the RFP to suggest that NAVAIR had to perform the type of comparison suggested by EFW.  Instead, the RFP explicitly stated that "[t]he evaluators

shall not evaluate the relative attributes of one proposal as compared to another." AR Tab 8 at 104; see also Lumetra v. United States, 84 Fed. Cl. 542, 560–62 (2008).

Indeed, NAVAIR did more than "merely state that a cost realism analysis was performed." Dellew Corp., 128 Fed. Cl. at 193 (citation omitted). For example, the record shows that the Cost Evaluation Team ("CET") worked with the Technical Evaluation Team ("TET") to review the completeness and consistency of each offerors' estimates. AR Tab 80 at 14,617, 14,524; AR Tab 110 at 16,184–16,248, 16,250–51. In response to concerns over Collins's estimates, NAVAIR requested additional information from Collins about the feasibility of its approach. AR Tab 80 at 14,521–27, 14,524 (NAVAIR issued 31 evaluation notices to Collins). In response, Collins submitted over 200 pages of additional data which detailed its prior performance and estimating systems. See AR Tab 24.4i. The evaluators then made upward adjustments to Collins's proposed costs to account for any lingering concerns, contradicting EFW's argument that NAVAIR failed to identify or "meaningfully address" the cost differences. AR Tab 80 at 14,524. The Court therefore finds that NAVAIR did not ignore Collins's proposed costs but instead adjusted them to accord with the agency's experience. Accordingly, this protest ground, too, is unavailing. See Dellew Corp., 128 Fed. Cl. at 194.

### D.    Collins's Technical Risk Evaluation

EFW also takes issue with NAVAIR's assessment that Collins's proposal merited a "moderate" Technical Risk Rating. Dkt. No. 48 at 42. EFW argues Collins's proposal does not support this rating in light of NAVAIR's assignment of two significant weaknesses under the Technical Factor to Collins. Id. Under EFW's reading of the RFP, a proposal with more than one significant weakness, such as Collins's, was ineligible to receive a risk rating higher than "unacceptable." Id. Had NAVAIR assigned the appropriate "unacceptable" rating, EFW notes, Collins would no longer be eligible for award. Id. at 43. Therefore, EFW concludes that NAVAIR strayed from the RFP's evaluation scheme when assigning Collins's Technical Risk. Id. at 44.

The Government and Collins respond that EFW mischaracterizes the RFP's requirements and assigns a quantitative assessment when the RFP calls for a qualitative evaluation. See Dkt. No. 53 at 51; Dkt. No. 54 at 50. Instead, they contend that under the RFP the Technical Risk Rating was based on the extent a significant weakness would impact performance, increase costs, or degrade performance. AR Tab 10 at 205. The evaluators would then assess the amount of government assistance necessary to overcome any difficulties. Id. The Government and Collins argue that the evaluators considered Collins's two significant weaknesses but exercised their reasonable judgment in concluding that as a whole Collins's proposal posed a moderate risk. AR Tab 80 at 14,467–72. In any event, they state that "[i]n bid protests 'adjectival ratings are merely a guide' for the agency's decision making process." Dkt. No. 53 at 51 (quoting Hyperion Inc. v. United States, 92 Fed. Cl. 114, 119 (2010)).

An agency's technical evaluation receives great deference, which the Court will not second guess. See E.W. Bliss Co., 77 F.3d at 449. "[W]here an agency's decisions are highly technical in nature, ... judicial restraint is appropriate and proper." Electro-Methods, Inc. v. United States, 7 Cl. Ct. 755, 762 (1985); see also Burroughs Corp. v. United States, 617 F.2d 590, 597 (Ct. Cl. 1980) (explaining that the higher the degree of discretion afforded to the official, the more difficult it is to prove the decision was unreasonable). Here, the technical team's evaluation of Collins found two significant weaknesses, two risk reducers, and no uncertainties or deficiencies. AR Tab 80 at 14,467–68. The significant weaknesses in Collins's approach were due to the lack of desired level of technical maturity for its night vision sensor and display. Id. The evaluators considered the potential repercussions of the significant weaknesses, the amount of government oversight needed, and the remaining technical hurdles as well as Collins's proposed mitigation strategies. Id. at 14,456–72. While EFW harps on Collins's two weaknesses, it ignores the evaluators' assessment of two risk reducers for Collins's prior experience with similar technology, which offset the impact of Collins's significant weaknesses. Id.

EFW's contrived quantitative assessment rests on misstatements and distortions of the RFP's evaluation criteria. EFW's interpretation conflates the RFP's Technical Risk Rating's qualitative approach with a quantitative one. The RFP's Technical Risk Rating "is not governed by a simple count of strengths and weaknesses" and common sense counsels that some strengths are more important, and some weaknesses pose greater risks. N.S. Consulting Grp. LLC. V. United States, 141 Fed. Cl. 549, 557 (2019) (citation and quotation omitted); see also McConnell Jones Lanier & Murphy LLP v. United States, 128 Fed. Cl. 218, 231 (2016). Under the RFP, a technical factor provided for two assessments: (1) an assessment of the offeror's compliance with the solicitation's requirements (Technical Rating) and (2) an assessment of the risk associated with the proposed approach (Technical Risk Rating). AR Tab 10 at 205. Regarding the Technical Risk Rating, a moderate rating may be appropriate for a "proposal [that] contains a significant weakness or combination of weaknesses…" Id. at 207–08. An unacceptable Technical Risk Rating meant a "[p]roposal contains a material failure or a combination of significant weaknesses that increase the risk of unsuccessful performance to an unacceptable level." Id. Under the terms of the RFP, offerors could receive either low, moderate, high, or unacceptable Technical Risk Ratings. Id.

EFW misconstrues the RFP to require the evaluators to assign, at a minimum, an unacceptable risk to any proposal with more than a single significant weakness. Id. The language EFW uses to define the unacceptable adjectival Technical Risk Rating refers to the Technical Rating (assessing compliance) and not the Technical Risk Rating; these are two distinct evaluations. Regarding technical ratings, an unacceptable adjectival rating would be provided to proposals that do "not meet requirements of the solicitation and, thus, contain one or more deficiencies and is unawardable." Id. at 207. The RFP defined a deficiency as "[a] combination of significant weaknesses that increase the risk of unsuccessful contract performance to an unacceptable level." AR Tab 8 at 95–96. By its

terms, the RFP only places a threshold on the amount of deficiencies a proposal could receive in its Technical Rating but, contrary to EFW's interpretation, included no such limitation on the allowable significant weaknesses in the Technical Risk Rating. Id.

EFW's challenge indicates a disagreement with the agency's technical evaluation but does not itself render the evaluation irrational. Rather, the record demonstrates that NAVAIR conducted a thorough assessment and properly considered the technical challenges before concluding the contractor could overcome them. Based upon the above analysis, the Court finds NAVAIR's assessment that Collins's approach warranted a Technical Risk Rating of moderate was reasonable and in compliance with the RFP's evaluation criteria.

E.    EFW's Technical Risk Rating

In its list of purported errors, EFW also asserts that NAVAIR, in analyzing the technical proposals, did not treat the two offerors equally and used unstated evaluation criteria. Dkt. No. 48 at 20. The SSEB assigned EFW's proposal four risk reducers for its inclusion of multiple solutions, its prior technical experience, and its design approach. AR Tab 80 at 14,484–90. Additionally, the SSA assigned EFW's proposal a significant weakness. Id. at 14,488–89. EFW postulates this was "solely" because of the length of time, approximately a year, it would take for EFW's sensor to reach technical maturity. Dkt. No. 48 at 46. In ascribing a significant weakness, NAVAIR concluded that the "immature technology element, showed that it had the opportunity to cause a disruption to program schedule." AR Tab 80 at 14,490. EFW does not dispute that its proposed sensor will not achieve technical maturity until a year after the contract is awarded. Dkt. No. 48 at 45. Instead, EFW claims this determination is based on unstated evaluation criteria; thus, EFW "had no way to know that NAVAIR would downgrade its proposal at all, let alone with a significant weakness, because of its proposed schedule." Id. at 46.

The Government and Collins respond that NAVAIR's assignment of this significant weakness was based on the implications of the EFW proposal's technological immaturity, including scheduling delays and increased costs, not merely on the length of time it would take to reach maturity. AR Tab 81 at 14,541. In response to EFW's belief that its dual approach is technically superior, the Government and Collins state that EFW's alternate sensor also lacked technological maturity. Id.

The Court is not persuaded by EFW's argument that an offeror's time to maturity was not a stated evaluation criterion. The RFP specified that NAVAIR would evaluate the risks associated with each approach, including elements such as "Risk Identification and Mitigation," and "Technical Maturity." AR Tab 10 at 204–05. And even if NAVAIR employed unstated methodology, EFW cannot possibly demonstrate that it was prejudiced. See Data Gen. Corp., 78 F.3d at 1562. Collins received, in EFW's words, "twice as many" significant weaknesses for its technical maturity. Dkt. No. 48 at 19. The Court also

disagrees with EFW's assessment that its dual sensor approach "is inherently less risky" than Collins's proposed single sensor.  Id. at 21.  EFW's proposal may have included a "Plan B," but the SSA was entitled to make the business judgment that "regardless of the design benefit of interchangeability…both sensor technologies represent risk to the Government."  See Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. 488, 514 (2009).

Given the highly technical nature of the proposal at issue, the Court declines to substitute its judgment for that of the agency, and instead defers to the technical expertise of NAVAIR's procurement official.  See Beta Analytics Int'l, Inc. v. United States, 67 Fed. Cl. 384, 395 (2005).

F.    SSA Departure from SSEB Evaluation

Pressing on, EFW targets the SSA's technical risk evaluation.  Dkt. No. 48 at 47–49.  EFW argues that the SSA "unreasonably" overruled the SSEB's decision to assign EFW's technical proposal a risk reducer for its dual sensor risk mitigation approach.  AR Tab 81 at 14542; see also AR Tab 14(a) at 1298 (defining risk reducer as "[a]n aspect of an Offeror's proposal that reduces risk in a way that will be advantageous to the Government during contract performance").  In its proposal, EFW included both a primary and backup technology to mitigate potential risks should one technology fail.  AR Tab 71.8 at 12,342–43.  The SSEB discussed the proposed risk mitigation and agreed with EFW that having an alternate solution would be advantageous to the Government.  AR Tab 80 at 14,484–85.

The SSA, however, disagreed with the value of EFW's alternative solution, particularly because the backup technology was not mature.  AR Tab 81 at 14,542.  The SSA stated that "neither sensor technology is mature…[and] both technologies represent risk to the Government."  AR Tab 81 at 14,542.  The SSA explained that while making the change to the alternative solution would have minimal schedule impact, it could lead to additional costs as high as $858,000.  AR Tab 81.  As a result, unlike the SSEB, the SSA concluded that EFW's dual approach did not merit a risk reducer.  Id.  NAVAIR and Collins argue that the SSA had the discretion to determine that EFW's dual approach did not provide a benefit to the Government.  See Dkt. No. 53 at 60–61; Dkt. No. 54 at 57–58.

It seems clear that the SSA is required to exercise "independent judgment" and is not limited to the recommendation of the SSEB.  DCMS-ISA, Inc. v. United States, 84 Fed. Cl. 501, 515 (2008); see also FAR 15.308.  As a matter of law, "[s]ource selection officials are not bound by the recommendations of lower-level evaluators, and as a general rule, [the Court] will not object…absent unreasonable or improper action."  L-3 Commc'ns Integrated Sys. V. United States, 79 Fed. Cl. 453, 462 (2007) (citation omitted).  Here, the SSA reasonably concluded that EFW's dual sensor approach did not warrant a risk reducer.  AR Tab 81 at 14,542.  In arriving at this conclusion, the SSA reviewed each offeror's

technical approach and the SSEB's conclusion.  AR Tab 81; see also AR Tab 80 at 14,485. The SSA explicitly acknowledged the SSEB's assignment of a risk reducer to EFW and "recognized the technical value of interchangeability with multiple design solutions."  AR Tab 81 at 14,542. However, the SSA determined that both of EFW's sensors were immature technology and any benefit would accrue only after EFW had been unable to mature the primary sensor.  Id. at 14,542–43.

In the end, the SSA determined that the availability of multiple solutions did not offer a significant benefit.  At any rate, EFW would not have been materially better off as the SSA ultimately concurred with the SSEB's assignment of a moderate Technical Risk Rating to EFW's proposal.  AR Tab 81.  Accordingly, the SSA was well within its authority to exercise its independent judgment and disagree with the SSEB's conclusions.

G.    Best Value Analysis

Finally, EFW argues that NAVAIR misconstrued criteria in the RFP, so as to systematically favor Collins and disfavor EFW; that it neither credited EFW for the positives in its offer nor discredited Collins for the negatives in its proposal.  Dkt. No. 48 50–53.  Specifically, EFW contends that the agency placed too much importance on price in making its best value determination while deemphasizing EFW's "technical superiority."  Id. at 50.

The Government and Collins respond that the SSA performed a holistic review of the proposals and thoroughly compared each element of the proposals to determine which offered the best value.  AR Tab 81 at 14,541–42.  In the SSA's technical evaluation, she noted that Collins's sensor design had the ability to reach technological maturity faster than EFW's proposal.  Id. at 14,541.  However, the SSA also fully considered the risk to contract performance related to Collins's night vision sensor and LED displays technical maturity. Id.  Ultimately, the SSA concluded that EFW's proposal had a slight advantage over Collins's design.  Id.  With regards to Past Performance, the SSA determined that neither offeror had an advantage.  Id. at 14,542.  Finally, the SSA reviewed the cost proposals and noted the cost realism adjustments made to each offerors' proposed costs.  Id. at 14,543– 44.  At the conclusion of the trade-off analysis, the SSA found that EFW's slight advantage under the technical factor did not justify paying an almost $7 million premium.  Id. at 14,544.

An agency has substantial discretion to determine which proposal represents the best value for the Government.  See TRW, Inc. v. Unisys Corp., 98 F.3d 1325, 1327 (Fed. Cir. 1996).  When determining the best value to the Government, the "agency has the discretion to select a lower-priced, lower-technically-rated proposal if it decides that the higher price of a higher-technically-rated proposal is not justified."  Blackwater Lodge & Training Ctr., 86 Fed. Cl. at 514.  The agency will be able to demonstrate proper discretion

if "it documents its final award decision and includes the rationale for any business judgments and tradeoffs made." Id.

The bottom line is that EFW did not lose the competition because of the second P4 contract performance questionnaire, the SSA's decision that EFW's dual sensor approach did not warrant a risk reducer, or its higher cost. It lost because of the overall inferiority of its proposal. Both proposals had weaknesses and both offerors had prior experience with similar technology. "Logic suggests that as [the magnitude of the price differential] increases, the relative benefits yielded by the higher-priced offer must also increase." Mil-Mar Century Corp. v. United States, 111 Fed. Cl. 508, 553 (2013). Thus, the SSA's conclusion that the minor technical difference did not evidence such a technical superiority to warrant a $7 million premium is reasonable and consistent with the RFP.

III.   Permanent Injunction

Under its bid protest jurisdiction, the Court has the power to issue an injunction pursuant to 28 U.S.C. § 1491(b). See PGBA, LLC v. United States, 389 F.3d 1219, 1223 (Fed. Cir. 2004) ("We give deference to the Court of Federal Claims' decision to grant or deny injunctive relief, only disturbing the court's decision if it abused its discretion."). In deciding whether to grant a permanent injunction, a court considers (1) whether the plaintiff has succeeded on the merits; (2) whether the plaintiff will suffer irreparable harm without an injunction; (3) whether the balance of the hardships favors an injunction; and (4) whether an injunction is in the public interest. Id. at 1228–29 (citation omitted).

Because EFW has not succeeded on the merits of its complaint, the Court finds no legally compelling reason to issue an injunction.

Conclusion

For the reasons set forth above, the Court DENIES EFW's motion for judgment on the administrative record and DENIES EFW's motion to permanently enjoin NAVAIR from proceeding with the solicitation for a binocular helmet-mounted night vision device in support of the EVA program. The Court GRANTS the Government's motion for judgment on the administrative record. The Clerk of the Court is directed to enter judgment for the Government. No costs.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge